## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

United States of America,

v.                                          Case No. 1:21-cr-328-MLB

Brian Sperber,

                    Defendant.

_____/

## OPINION & ORDER

During a civil and criminal investigation of Defendant Brian Sperber, the United States seized a waterfront mansion Defendant had previously purchased. The United States later sold the property and held the proceeds as substitute res. Defendant (currently represented by the Federal Defender Program) says he used some legitimate income to purchase the property and needs that money to hire a lawyer. The Court concludes Defendant is entitled to recover $1,000,000.00 from the proceeds of the sale of the house.

## I.   Background Facts

In March 2021, the United States filed a civil forfeiture action to seize a mansion Defendant and his wife owned in Boca Raton, Florida.

(*See United States v. Real Property Located at 311 East Key Palm Road*, 1:21-cv-1008, Dkt. 1.)  The United States alleged Defendant (working with a co-defendant) fraudulently represented to several companies that he had personal protective equipment ("PPE") to sell and then used false invoices, documents, purchase orders, and wire confirmations to trick those companies into sending him nearly $13 million.  (*Id.* at ¶¶ 12–77.) Despite receiving the money, Defendant never delivered the PPE.  (*Id.*) The United States said that, during the course of the illegal conspiracy, Defendant—through a company his wife owned called Roses Ark LLC— bought the Boca Raton mansion for about $10 million, which included a down payment of nearly $5 million.  (*Id.* at ¶¶ 3, 16, 62.)  The United States alleged its investigation "revealed that approximately $4.3 million of the down payment was funded by proceeds of [Defendant's] fraudulent schemes[.]"  (*Id.* at ¶ 63.)

The United States and Roses Ark later agreed to have the property liquidated.  (*Id.*; Case No. 21-cv-1008, Dkts. 22, 26.)  It sold for $12.1 million.  The United States satisfied the outstanding mortgage but continued holding the remaining money (totaling $4,915,704.39) as substitute res for the property.  (*Id.*; Case No. 21-cv-1008, Dkts. 23, 30,

37.)

In August 2021, the United States obtained an indictment against Defendant, charging him with conspiracy, money laundering, and wire fraud.  (Dkt. 1.)  The indictment alleges the same fraudulent conduct as the civil forfeiture action, specifically that Defendant "defrauded prospective PPE purchasers out of more than $12 million, much of which he used for his own personal benefit, which included purchasing" the Boca Raton property.  (Dkt. 1 at ¶ 9.)  The indictment says Defendant used "over $5.3 million of Victim B's funds to purchase" the property.  (Dkt. 1 at ¶ 19.)  The United States later identified Victim B as LHP Pharma, Inc.  (Dkt. 118 at 18:25–19:4.)  The indictment identifies the $4.9 million in substitute res from the sale of the property as subject to forfeiture as either proceeds of Defendant's fraudulent scheme, property involved in the money laundering offense, or property traceable to such property.  (Dkt. 1 at ¶¶ 39–40.)  The United States seeks forfeiture of that money pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and 18 U.S.C. § 982(a)(1).  (Dkt. 1 at ¶ 39.)  The United States and Roses Ark decided—with court approval—to stay the civil forfeiture case and proceed with forfeiture pursuant only to the indictment.  (Dkt. 57 at 5:12–

21.)

Defendant was arraigned on August 31, 2021. (Dkt. 4.) The same day, Magistrate Judge Anand appointed the Federal Defender to represent Defendant, concluding Defendant "has testified under oath or has filed with the Court an affidavit of financial status and hereby satisfied this Court that he . . . is financially unable to employ counsel." (Dkt. 6.) Defendant later filed a motion to hire counsel of choice (Dkt. 23) and a motion to release seized funds (Dkt. 24). Magistrate Judge Vineyard allowed Defendant to perfect his motion to release seized funds, explaining Defendant "was required to make a preliminary showing that he is financially unable to hire counsel from resources other than the seized property and that he is entitled to a pretrial hearing regarding the restrained property because it was improperly seized." (Dkt. 26.) Defendant filed an amended motion, along with an unsworn "Monthly Cash Flow Statement" and "Net Worth Statement." (Dkts. 30, 31.)

In his amended motion, Defendant moved for the release of approximately $700,000, saying that money was not part of the illegal activity. (Dkt. 30 at 1, 4.) He argued he was entitled to a pretrial hearing at which the United States would "have the burden of showing by

competent evidence that the funds seized are traceable to criminal conduct." (Dkt. 30 at 7.)  The United States countered that Defendant "failed to meet his threshold burden of adequately demonstrating his inability to afford his counsel of choice" and was therefore "not entitled to a tracing hearing." (Dkt. 37 at 7.)

The Magistrate Judge issued a Report and Recommendation, saying this Court should deny Defendant's motion.  (Dkt. 39.)  The Magistrate Judge concluded Defendant's documents were insufficient to establish financial need because they were not "signed under oath." (Dkt. 39 at 12.)  The Magistrate Judge explained that, even if he had credited "the limited financial information provided by [Defendant]" and found "that he has demonstrated that he does not have the financial resources to hire his counsel of choice," Defendants' motion would still fail because Defendant "has not satisfied the standard for obtaining a hearing." (Dkt. 39 at 15.)  Specifically, the Magistrate Judge found that "even if $700,000 of the funds used to make the down payment were, in fact, untainted, the entire substitute res . . . remains subject to forfeiture because those funds allegedly were involved in the money laundering transaction regarding the purchase of the Boca Raton property, as charged in the indictment."

(Dkt. 39 at 16.)  The Magistrate Judge also enumerated two other reasons that warranted against a hearing: (1) after being notified of the forfeiture action, only Roses Ark (and not Defendant) filed a verified claim to the property, showing Defendant was trying to "distanc[e] himself from any interest in the [] seized funds," and (2) Defendant did not demonstrate prejudice because "he has not made a sufficient showing that the substitute res has been unlawfully restrained."  (Dkt. 39 at 20–24.)

Defendant filed objections.  (Dkt. 43.)  He says the Magistrate Judge misapplied the law and "failed to consider the evidence presented" in his filings.  (Dkt. 43 at 6.)  Specifically, he contends (1) Supreme Court precedent applying the Sixth Amendment required the Magistrate Judge to release untainted funds and (2) the Magistrate Judge ignored financial documents he submitted showing he does not have the financial ability to hire counsel without the seized funds.  (Dkt. 43 at 6–15.)  In response, the United States argues the Magistrate Judge was right in finding "the '$700,000 portion of the down payment was commingled with the fraud proceeds in the money laundering transaction,' and, therefore, 'the entire substitute res is subject to forfeiture,' pursuant to 18 U.S.C. § 982(a)(1)." (Dkt. 48 at 2.)  It also contends the Magistrate Judge was right to find

Defendant's financial documents were insufficient.  (Dkt. 48 at 3–4.)

## II.    Discussion[1]

Pre-trial restraint of a criminal defendant's assets is constitutionally permissible "whenever there is probable cause . . . to think (1) that the defendant has committed an offense permitting forfeiture, and (2) that the property at issue has the requisite connection to that crime." *Kaley v. United States (Kaley II)*, 571 U.S. 320, 323–34 (2014).  Property seized by the United States that is "not loot, contraband, or otherwise 'tainted'" belongs to the defendant, "pure and simple." *Luis v. United States*, 578 U.S. 5, 12–13 (2016).  And "the pretrial restraint of legitimate, untainted assets" that a defendant needs "to retain counsel of choice violates the Sixth Amendment." *Id*. at 10.  A defendant may—in

---

[1] Courts review de novo "those portions of [an R&R] to which an objection is made."  28 U.S.C. § 636(b)(1).  "It does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a de novo or any other standard, when neither party objects to those findings." *Thomas v. Arn*, 474 U.S. 140, 150 (1985).  And, in most cases, "[a] party failing to object to [an R&R] waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." *McGriff v. Comm'r, Soc. Sec. Admin.*, 654 F. App'x 469, 472 (11th Cir. 2016).  Since the R&R, the parties have engaged in extensive briefing and the Court has held multiple evidentiary hearings.  The Court thus reviews Defendant's motion to release funds de novo without regard to Defendant's specific objections.

limited instances—obtain a hearing to challenge the pretrial restraint of assets.  To be entitled to a tracing hearing, a defendant must (1) show "a bona fide need to utilize seized assets to conduct his [or her] defense," and (2) "make a prima facie showing that some portion of the assets is not traceable to the commission of the offenses alleged."  *United States v. Sachy*, 2022 WL 17177262, at *2 (M.D. Ga. Nov. 23, 2022) (quoting *United States v. Farmer*, 274 F.3d 800, 804 (4th Cir. 2001), and *United States v. Jones*, 160 F.3d 641, 647 (10th Cir. 1998)).  In addition, a defendant must also satisfy "the balancing test enunciated in" *Barker v. Wingo*, 407 U.S. 514 (1972).  *United States v. Kaley (Kaley I)*, 579 F.3d 1246, 1252 (11th Cir. 2009).  This requires the Court to consider (1) the length of the delay before the defendant receives a post-restraint hearing; (2) the reason for any delay; (3) the defendant's assertion of his or her right to a hearing; and (4) any prejudice the defendant suffered due to the delay weighed against the strength of the United States's interest in the subject property.  *Id.* at 1254.

A defendant who satisfies these initial burdens is entitled to a hearing to litigate "whether probable cause exists to believe that the assets in dispute are traceable or otherwise sufficiently related to the

crime charged in the indictment." *Kaley II*, 571 U.S. at 324; *United States v. Gosney*, 2023 WL 1434183, at *4 (11th Cir. Feb. 1, 2023) (explaining the grand jury's determination regarding the tracing of assets "may be challenged before trial"). Such a defendant may not relitigate the grand jury's finding of probable cause that the defendant committed a crime. *Id.* at 328–29; *see also Kaley I*, 579 F.3d 1246 at 1257 ("The purpose of the hearing [is not] to determine guilt or innocence but, rather, to determine the propriety of the seizure."). A defendant has "the burden of proof to determine the propriety of the seizure." *United States v. Hernandez-Gonzalez*, 2017 WL 2954676, at *5 (S.D. Fla. June 26, 2017) (emphasis omitted) (citing *Kaley I*, 579 F.3d at 1257). This means the defendant must convince the court there was no probable cause to believe "the assets in dispute are traceable or otherwise sufficiently related to the crime charged in the indictment." *Kaley II*, 571 U.S. at 324; *see also Kaley I*, 579 F.3d at 1257 (it is defendant's burden to show "assets described in the forfeiture count of the indictment were wrongfully seized").

## 1. Defendant Established His Right to a Pretrial Hearing

The Court scheduled a hearing on Defendant's objections to the

R&R for August 15, 2022. (Dkt. 49.) The United States argued Defendant had not sufficiently shown a financial need for the restrained assets to hire counsel of choice despite him having received a Federal Defender. (Dkt. 57 at 16:7–19.) Defendant countered that he provided sufficient information to the Court to show he "did not have sufficient assets or funds to provide or to pay to retain counsel," particularly given that he "was appointed counsel" for this case. (Dkt. 57 at 33:11–19.) Specifically, he emphasized that he "previously provided a sworn statement of his financial information and . . . a more current statement of his financial situation" but offered to provide "another affidavit that is more complete, that is sworn to and notarized." (Dkt. 57 at 37:20–24, 39:6–8.) He also said he "provided bona fide evidence to call into question the trace of [the seized] money, given" the discrepancy between "the civil forfeiture complaint that was filed" and the indictment. (Dkt. 57 at 32:21–33:1.) He argued that "at a hearing, the government . . . will have an opportunity to present evidence to explain this tracing of the funds," but that "at a minimum, [he had] presented evidence that should entitle [him] to a hearing on this issue." (Dkt. 57 at 33:2–6.)

The Court gave Defendant 15 days to file yet another sworn

financial affidavit—addressing the deficiencies identified by the Magistrate Judge. (Dkt. 57 at 14–19.) Defendant did so, filing a signed affidavit that included a cash flow statement, a net worth statement, numerous bank statements, and investment and tax documents. (Dkt. 53.) Upon review of that (and recognizing Defendant was appointed a Federal Defender), the Court concluded Defendant was entitled to a tracing hearing because he needs the seized assets to hire a lawyer. (Dkt. 54.)

The Court further explained its reasoning at the subsequent hearing. The Court noted Defendant's ex parte filing "essentially shows that he has no assets, no other accounts or things of that nature." (Dkt. 118 at 2:23-3:4-9.) The Court also recognized Defendant presented prima facie evidence that at least some portion of the down payment for the property was made using untainted funds—specifically, by pointing to the original forfeiture complaint, in which the United States claimed only $4.3 million of tainted money was used as part of a $5 million down payment. (*Id.* at 5:3-22.)

The Court also explained the four *Barker* factors favored Defendant. (Dkt. 118 at 7:2–7.) The Court agreed with the Magistrate

11

Judge's conclusion that "the approximately one-year delay since" the United States's civil forfeiture action "could support reaching the other [*Barker*] factors." (Dkt. 39 at 20 (citing *United States v. Dunn*, 345 F.3d 1285, 1296 (11th Cir. 2003) ("A delay is considered presumptively prejudicial as it approaches one year.")).) The Court also agreed with the Magistrate Judge's observation that the "reason for the delay and [Defendant's] assertion of his rights are somewhat intertwined." (Dkt. 39 at 20.) But the Court concluded the Magistrate Judge was wrong in finding these factors "do not weigh in favor of granting a hearing." (Dkt. 118 at 6:6-7:7.) Defendant moved to release untainted portions of the seized assets a little over four months after he was indicted—a reasonable period of time. (*Id*.) In holding otherwise, the Magistrate Judge pointed out that Defendant did not file a claim to the assets in the civil forfeiture action, and instead "only Roses Ark claimed ownership." (Dkt. 39 at 21.) But, as the Court explained at the evidentiary hearing, "it's not hard to imagine that somebody who faces a civil proceeding might not assert their own claims, . . . but once they come under indictment themselves," would—like Defendant—"quickly assert[] his right." (Dkt. 118 at 6:15–7:7.) So, while the year-long delay may

12

*technically* be attributable in part to Defendant, the Court found this "fairly unique situation" warranted in favor of a hearing. (Dkt. 118 at 7:2–7.)

While the Court did not discuss its prior determination that the final factor also weighs in Defendant's favor, the Court now explains that the seizure obviously prejudiced Defendant by preventing him from hiring counsel of his choice. In reaching the opposite conclusion as to this factor, the Magistrate Judge found Defendant did not make a "sufficient showing that the substitute res has been unlawfully restrained" because he did not refute the United States's position that all the assets were forfeitable as involved in Defendant's alleged money laundering. (Dkt. 39 at 23.) But the Magistrate Judge did not explain why he concluded all the funds were purportedly involved in money laundering.[2] And the

---

[2] Despite the prejudice prong being the "most searching" of the *Barker* factors, the Magistrate Judge gave its consideration short shrift. *United States v. Gosney*, 2022 WL 18542509, at *6 (S.D. Fla. June 10, 2022), *aff'd*, 2023 WL 1434183 (11th Cir. Feb. 1, 2023); *see also Kaley I*, 579 F.3d at 1258 (instructing courts to pay special attention to the prejudice factor). The Magistrate Judge simply concluded Defendant was not prejudiced because he could not show the money he wanted returned was not tied to the charged money laundering offenses. But the entire purpose of a tracing hearing is to allow the defendant to do just that— put on evidence to prove the restrained assets are not related to the charged crimes. Under the Magistrate Judge's view, a defendant could

United States's only argument on that front was that Defendant commingled untainted funds with tainted ones. As discussed below, that is not enough. The Court also concludes the United States has not presented evidence of any prejudice to its interests from having the hearing.[3]

### 2. The Court Held Evidentiary Hearings.

The Court held the evidentiary hearing on September 26, 2022. The United States presented testimony from FBI Special Agent Steve Ryskoski (an investigator on Defendant's case). He introduced and

---

almost never show prejudice sufficient to warrant a tracing hearing, or at least not so long as a defendant needed evidence to do so. As noted, Defendant made a prima facie showing that the at least some portion of the substitute res was illegally restrained. And his argument was not based on "a challenge to the reliability and competence of the underlying allegations of a fraudulent scheme in the indictment" but instead to an inconsistency between the indictment and the United States's initial forfeiture complaint. *See Gosney*, 2023 WL 1434183, at *5 (affirming district court's conclusion there was no prejudice sufficient to warrant a tracing hearing because defendant's only argument that assets were unlawfully restrained was that he did not commit indicted crimes).

[3] Shortly after the hearing, the United States issued a superseding indictment, saying Defendant used "millions of dollars" from LHP Pharm to purchase the Boca Raton property rather than "$5.3 million" as alleged in the original indictment. (Dkt. 58 at ¶ 19.) The superseding indictment still identifies the substitute res as subject to forfeiture. (Dkt. 58 at ¶ 39(b).) So the superseding indictment changes none of the issues currently before the Court.

testified about a spreadsheet summarizing—among other things—the inflow and outflow of cash from two bank accounts in the names of companies owned by Defendant (Ark Medical Solutions, LLC and A Rose RE, LLC) (Dkt. 71-3) and a "Payment Timeline" showing when those various deposits and expenses were made (Dkt. 71-4).  This showed the flow of money into the down payment for the Boca Raton property.  Defendant similarly presented a timeline of deposits and withdrawals from the two accounts.  (Dkts. 95-1; 95-2.)

About a month after the hearing, Defendant asked the Court to re-open the evidence and hold a second hearing so he could present additional evidence.  (Dkt. 83.)  The Court granted that motion.  (Dkt. 84.)  At the second hearing, Defendant presented testimony from a former business colleague about a transaction he allegedly conducted with Defendant during the relevant time period.  (Dkt. 91.)  The parties filed post-hearing briefs.  (Dkts. 95; 100.)  The Court then held a third hearing to permit the parties to argue their respective positions as informed by the evidentiary hearings and their competing briefs.  (Dkt. 121; 123.)

## B.   Analysis

In Counts One through Five of the Superseding Indictment, the

United States charged Defendant with wire fraud and conspiracy to commit wire fraud.  (Dkt. 58 at 10-12.)  As a result, the United States may obtain forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" such those offenses.  *See* 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).  The United States contends the money from the sale of the Boca Raton property is forfeitable under these provisions.  (Dkt. 58 at ¶ 39.)  In Counts Six through Ten, the United States also charged Defendant with money laundering offenses, allowing it to seek forfeiture of "any property, real or personal, involved in such offense, or any property traceable to such property."  See 18 U.S.C. § 982(a)(1).  (Dkt. 58 at 12-17.)  The United States contends the money from the sale of the Boca Raton property is also forfeitable under this provision.  (Dkt. 58 at ¶ 40.)  So, the Court now considers whether—having had an evidentiary hearing—Defendant has shown the absence of probable cause for forfeiture of some or all of the substitute res by showing that some amount of money included in the purchase of the Boca Raton property (and thus part of the substitute res) was (1) not the proceeds of the wire fraud offense and (2) not involved in the money laundering offenses or traceable to property involved in those

offenses.   In his post-hearing briefing, Defendant references three transactions he claims involved legitimate proceeds that went towards the purchase of the Boca Raton property: (1) $1.5 million that one of his companies received from LHP Pharma (2) $179,985 that another one of his companies received from a customer identified as M. House Pty. and (3) $117,570 that one of his companies allegedly received from a customer known as Texas Private Wealth, LLC.  (Dkt. 95 at 7–8.)

### 1.   "Proceeds" Theory of Forfeiture

Property is forfeitable as proceeds if it is "derived from" or "traceable to" the underlying charged offense.  18 U.S.C. § 981(a)(1)(C).[4] Courts use a "but for" test in determining whether property so qualifies. *See United States v. Hoffman-Vaile*, 568 F.3d 1335, 1344 (11th Cir. 2009). In other words, "property 'traceable to' means property where the acquisition is attributable to the [alleged] scheme rather than from money obtained from untainted sources." *United States v. Bornfield*, 145

---

[4] Although § 981(a)(1)(C) deals with civil forfeiture, 28 U.S.C. § 2461(c) authorizes criminal forfeiture based on civil forfeiture statutes for certain offenses, including wire fraud that does not affect a financial institution. The United States cites this Title 28 statute in the indictment.  (Dkt. 58 at ¶ 39.)

F.3d 1123, 1135 (10th Cir. 1998) (citing *United States v. Voigt*, 89 F.3d 1050, 1084–87 (3d Cir. 1996)); *see also* 18 U.S.C. § 981(a)(2)(A) (defining proceeds as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto"). "[O]nly funds used in or traceable to the illegal activity are subject to forfeiture, and not any commingled legitimate funds used in facilitating the scheme." *United States v. United States Currency Deposited in Account No. 1115000763247*, 176 F.3d 941, 946 (7th Cir. 1999).

### a)   LHP Pharma, Inc.

At the evidentiary hearing, Special Agent Ryskoski testified that Defendant (and perhaps his coconspirator) defrauded LHP Pharma of more than $10 million as part of the wire fraud and money laundering schemes.  (Dkts. 71-3; 118 at 15:6-20:23; 33:2-33:25.)  In relevant part, the evidence introduced at the hearing showed that, on March 24, 2020, LHP Pharma paid Ark Medical Solutions $2.8 million.  (Dkts. 71-4; 95-1.)  At the time it received the deposit, Ark Medical Solutions had a balance of just $6,297.33.  (Dkt. 95-1.)  On March 25, Ark Medical Solutions transferred $2.7 million of that money to A Rose RE.  (Dkt. 95-

18

2.)  Because A Rose RE had a negative balance before the transfer, the $2.7 million deposit left A Rose RE with a balance of $2,590,114.91.  (*Id.*) On March 26, A Rose RE transferred $1 million to a company called Realogy Holding Corp. as an initial payment for the Boca Raton property. (Dkt. 95-2.)[5]

Agent Ryskoski testified that, in exchange for the payment of $2.8 million, Defendant delivered LHP Pharma $1.5 million worth of PPE. (Dkt. 118 at 33:14–19.)  The United States thus concedes that $1.5 million of the $2.8 million payment from LHP Pharma was not part of Defendant's fraudulent scheme—or to use the parties' words, $1.5 million was "untainted" by the fraud.  (Dkt. 135 at 18:22–19:8.)  The United States further concedes the $1 million payment A Rose RE made to Realogy on March 26 was untainted.  This means that the initial $1 million paid for the Boca Raton property is not traceable to proceeds of the fraud.

None of the remaining $500,000 that A Rose RE received went to the purchase of the Boca Raton property.  Instead, bank records show

---

[5] Agent Ryskoski testified Realogy "was one of the entities where money was sent to purchase the house."  (Dkt. 118 at 21:6–8.)

that, following the $1 million payment, A Rose RE paid various amounts to unrelated entities until its account balance went negative on March 27. (Dkts. 71-3; 95-2.)  Defendant acknowledged this reality at the final hearing. (Dkt. 135 at 33:7–25.)  Specifically, he agreed with the Court's conclusion that, assuming "the $1 million that went to the Realogy Holdings was 100 percent legitimate, . . . [y]ou still can't carry the $500,000 remaining untainted balance past the point where that account hits zero.  And that occurs on 3/27, according to [the A Rose RE records]. So by that time, any untainted funds are out of the account." (*Id.*)

LHP Pharma made a second, $8.25 million payment to Ark Medical Solutions on March 31. (Dkts. 71-3; 71-4; 95-1.)  Defendant has presented no evidence—and really does not contend—any of this money was untainted.  The next day, Ark Medical Solutions paid Realogy another $1 million towards the purchase of the Boca Raton property. (Dkts. 71-3; 71-4; 95-1.)   On May 1, LHP Pharma made a final payment to Ark Medical Solutions of $2.5 million.  (Dkts. 71-3; 71-4; 95-1.)   Again, Defendant does not argue this money was untainted.  Then, on May 4, Ark Medical Solutions paid the rest of the money making up the approximately $5.3 million down payment for the purchase of the Boca

Raton property.  (Dkts. 71-3; 71-4; 95-1.)

### b)   M. House Pty. Ltd.

On March 13, 2020, M. House Pty. Ltd. wired $179,985 to the A Rose RE account.  The wire detail indicated that the money was for the purchase of "Halyard masks and gowns."  (Dkts. 71-4; 95-2; 118 at 30:22–31:4.)  Agent Ryskoski testified that, because M. House is in Australia, he had not been able to speak with one of its representatives.  (*Id.* 30:22-25.)  But a representative from Halyard told him Defendant could not have shipped the products listed on the wire detail to Australia.  (Dkt. 118 at 30:16–31:4.)  Special Agent Ryskoski thus concluded M. House was a victim of Defendant's scheme when it wired A Rose RE $179,985.

The Court concludes Defendant has failed to show he is entitled to some return of the substitute res as a result of this payment.  The Court credits Agent Ryskoski's testimony that M. House did not (and could not) have receive the products for which it paid Defendant $179,985 on March 13, 2020.  Agent Ryskoski was a credible witness and he explained the basis for his conclusion.  Defendant did not really challenge that.  Rather, Defendant showed that Ark Medical paid M. House $200,000 on April 1, 2020.  (Dkt. 95-1.)  Defendant characterized this as a "refund."  (Dkt. 118

at 40:23–22.)  That payment does not undermine the United States's probable cause argument, as Defendant offered no evidence to support his characterization.  But, even if Defendant refunded the money, that would simply mean none of the money Defendant received from M. House went toward the purchase of the Boca Raton property (or could be included in the substitute res).  So, Defendant's characterization of the April 1 payment as a "refund" would not entitle him to the return of any portion of the substitute res.

Bank records introduced by the United States also show none of the $179,985 from M. House went towards the purchase of the property. Before M. House sent A Rose RE the $179,985 on March 13, A Rose RE's account had a negative balance of $97,070.09.  (Dkt. 95-2.)  After receiving that money, A Rose RE wired all of it to other entities, leaving its account with a negative balance of $51,085.09 by the end of the same day. (Dkt. 95-2.)  So, Defendant has not shown any of the money received from M. House went towards the purchase of the Boca Raton property or could possibly be included in the substitute res.

### c)   TX Private Wealth, LLC

On April 29, 2020, TX Private Wealth, LLC (on behalf of a company

called Bold International, Inc.) wired $229,275.20 to the Ark Medical Solutions account for the purchase of medical supplies. (Dkts. 71-3; 71-4; 95-1; 118:8–16.) Agent Ryskoski testified that, in exchange, TX Private Wealth "received product totaling approximately $20,000." (Dkt. 118 at 32:1–3.) Accordingly, the United States considers only the remainder of that deposit—$209,587.70—to be derived from the alleged fraud. (Dkts. 71-3.)[6] From this, the Court accepts that the difference—$19,687.50—is not traceable to the proceeds of the unlawful activity. But, there is no evidence this money went towards the purchase of the Boca Raton property. Ark Medical Solutions spent more than $1.6 million from this account within days of receiving this money and more than $4 million more before the final payments on May 4, 2020 for the purchase of the property. During that same time—and as explained above—the company received $2.5 million from LHP Pharma as part of its fraudulent activity. (Dkt. 95-1 at 3.) In the light of this churning of the account, Defendant has not shown the $19,687.50 he received on April 29 was part of the final

---

[6] The United States's spreadsheet separately lists the $209,587.70 under "Deposits" paid by "Victims." (Dkt. 71-3.) The other $19,687.50—for which TX Private Wealth received product—is listed under "Other." (Dkt. 71-3.)

payments on May 4.

Defendant does not challenge this. Instead, Defendant presented testimony from Brandon Davis, one of the owners of TX Private Wealth, that Defendant provided (and was paid for) $117,570 worth of PPE in a separate transaction. (Dkt. 117 at 18:14–19:22.) Specifically, Davis said he served as a middleman between Defendant (who provided PPE) and a company called MJG (that received and paid for the PPE) because Defendant did not want to work with MJG directly due to some unidentified conflict. (Dkt. 117 at 18:25–19:11.) Defendant says he is entitled to this money and that it is "reflected" in his bank transactions. (Dkt. 95 at 8.)

The Court disagrees. As a threshold matter, the only entry showing a payment from TX Private Wealth to Defendant is the wire transfer of $229,275.20 discussed above. (Dkt. 95-1.) There is no evidence (other than Davis's testimony) that TX Private Wealth made a separate, legitimate payment of $117,570. And the Court found Davis highly uncredible. He told a long and incoherent story about the transaction, referred to Defendant alternatively as a "supplier" and a "distributor," admitted the money was paid to conceal the supplier, and could provide

24

few details.  (Dkt. 117.)  In addition, he introduced an alleged invoice for the transaction.  (Dkt. 93-2.)  It indicates a wire to the Ark Medical Solutions account at issue on or about April 23, 2020 for $117,570.  (*Id.*)  But, as already discussed, the bank records contain no evidence Ark Medical Solutions received that wire.  (Dkt. 95-1.)  Davis's credibility was far too lacking to override the absence of evidence in the bank records. Defendant thus has not shown this money was ever received let alone that it went to the purchase of the Boca Raton property.

### d)    Conclusion Regarding Proceeds Forfeiture

Defendant has shown the lack of probable cause to believe the initial payment of $1 million for the Boca Raton property is forfeitable as proceeds of the fraudulent activity.  He has failed, however, to show the other payments he identified either were not the proceeds of fraudulent activity and/or that the money went into the purchase of the property. He is not entitled to the return of those funds.

### 2.    "Involved In" Theory of Forfeiture

Because the Court has concluded there is probable cause to believe all but $1 million of the substitute res is forfeitable as proceeds of the wire fraud scheme, the only remaining question is whether Defendant

has shown the absence of probable cause to conclude the $1 million initial payment for the property is forfeitable as having been "involved in" the money laundering scheme or traceable to property "involved in" that scheme.

The United States contends that, because the untainted money was commingled with proceeds of the alleged fraud for the purchase of the Boca Raton property, that money was "involved in" money laundering and is forfeitable under 18 U.S.C. § 982(a)(1). (Dkt. 100 at 11–13.) Specifically, the United States says because Defendant commingled the untainted money with tainted money (both in his bank account and in purchasing the property), the untainted funds "facilitate[d]" money laundering and are thus forfeitable. (Dkt. 100 at 11.) Defendant says little in response to the United States's theory. He argues that because the money was commingled, and "the overwhelming majority of the transactions have no relation to the alleged fraud," the assets cannot be easily divided, and Defendant is entitled to recover all the funds. (Dkt. 95 at 15–16.) He also says the money laundering charges fail (an issue that is pending as part of his motion to dismiss), so the funds could not have been involved in those offenses. (Dkt. 135 at 69:13–19.) Defendant's

position does nothing to assist the Court in reaching a decision.

Still, the Court rejects the United States's contention that the mere comingling of funds warrants the forfeiture of untainted funds particularly when—as here—the untainted funds can be easily traced and "un-mingled." The United States relies on *SEC v. Lauer*, 2009 WL 812719 (S.D Fla. March 26, 2009), and *United States v. Ward,* 197 F.3d 1076 (11th Cir. 1999), for the proposition that "when money is commingled, the illicitly-acquired funds and the legitimately-acquired funds cannot be distinguished from each other." (Dkt. 100 at 8.) Those cases do not really speak to the issue before this Court. The defendant in *Lauer* sought the release of cash held in a brokerage account from a previous sale of stock. The Court concluded that any "untainted" funds had been washed out of his brokerage account through a prior transaction and had not been used to purchase the stock at issue. 2009 WL 812719 at *5. The court in that case specifically held that it was "not a case of mere commingling of tainted and untainted funds in an account." *Id.* at *5. And *Ward* addressed the issue of whether the United States was required to trace illegal proceeds as part of substantive money laundering charges under 18 U.S.C. § 1956. 197 F.3d at 1078–79. In rejecting that

idea, the Eleventh Circuit held the money laundering statute "permits **convictions** where the funds involved in the transaction are derived from a commingled account of which only a part comes from 'specified unlawful activities.'" *Id.* at 1082 (emphasis added). This matter involves a forfeiture statute.

The Eleventh Circuit's decision in *United States v. Puche*, 350 F.3d 1137 (11th Cir. 2003) is more helpful. In that case, a defendant convicted of money laundering drug proceeds appealed the forfeiture of untainted funds that had been comingled with drug proceeds. The Eleventh Circuit explained property is not "involved" in a money laundering offense simply because it is commingled with tainted funds. It said "the mere pooling or commingling of tainted and untainted funds in an account does not, without more, render the entire contents of the account subject to forfeiture." *Puche*, 350 F.3d at 1153 (internal citations and quotations omitted). Instead, "[f]orfeiture of commingled funds . . . is proper when the government demonstrates that the defendant pooled the funds to facilitate or 'disguise' his illegal scheme." *Id.* The Court affirmed the forfeiture determination based on evidence from which the jury could have concluded the defendant commingled legitimate funds with the

28

drug proceeds "to conceal the nature and source of the narcotics proceeds" and that "the jury could have inferred that the legitimate proceeds facilitated the illegal proceeds by acting as a 'cover' and hence reduced suspicion of the latter's source." *Id*. at 1154. No evidence suggests the $1 million Defendant received from LHP Pharma and almost immediately wired out for the purchase of the Boca Raton property did that. In other words, there is nothing "more"—aside from its commingling with tainted funds in the purchase of the property—that renders that money forfeitable.

The United States also relies on *United States v. Kivanc*, 714 F.3d 782 (4th Cir. 2013), in which the Fourth Circuit held that "[w]hen legitimate funds are commingled with property involved in money laundering . . . the entire property, including the legitimate funds, is subject to forfeiture." (Dkt. 100 at 11.) The Court rejects that argument for several reasons. First, *Kivanc* is not binding and, to the extent is says what the United States says it does, it conflicts with the Eleventh Circuit's decision in *Puche*. Second, *Kivanc* dealt with 18 U.S.C. § 981, not § 982. Third, the authority *Kivanc* cited for that proposition similarly dealt with different statutes and/or involved situations in which the

untainted funds concealed the tainted funds. *Kivanc*, for example, cited *United States v. McGauley*, 279 F.3d 62, 71 (1st Cir. 2002). But in that case, the First Circuit upheld a district court instruction stating "the commingling of tainted funds (mail fraud proceeds) with legitimate funds is enough to expose the legitimate funds to forfeiture, *if* the commingling was done for the purpose of concealing the nature or source of the tainted funds." *Id.* at 76 (emphasis added). The *Kivanc* court also cited *United States v. Baker,* 227 F.3d 955 (7th Cir. 2020), a case in which the Seventh Circuit upheld the forfeiture of untainted money that had been comingled with tainted money upon evidence the untainted money "bankrolled" the illegal money laundering operation. *Id.* at 969. Finally, the *Kivanc* court cited the Eleventh Circuit's decision in *United States v. One Single Family Residence,* 933 F.2d 976, 981–82 (11th Cir. 1991). That case involved a drug forfeiture statute and whether an innocent owner was entitled to recover legitimate funds commingled with tainted property. *Id.* Neither *Kivanc* nor the cases cited therein persuade the Court that mere commingling is sufficient to consider untainted funds "involved" in a money laundering offense. As *Puche* instructs, there must be something more.

In an effort to show "more," the United States says (1) "the untainted funds resulted . . . from [Defendant's] misrepresentations that caused [LHP Pharma] to send the payment" (Dkt. 135 at 64:17–20), and (2) Defendant ultimately used both the untainted and tainted funds to purchase the property (Dkt. 100 at 12–13). The United States's first argument is untenable given its concession that the initial $1 million was untainted. The United States does not argue, for example, that the money was used to conceal the alleged fraud (or proceeds from the fraud), to convince LHP Pharma to spend more, or for any other purpose.[7] The

---

[7] The Court invited the United States to make such an argument even though it was not included in its briefing. At the final evidentiary hearing, the Court recognized the $1.5 million was not proceeds but asked "is it property involved in the offense, because it is used to pay for the gloves that were delivered in order to lull the victim into the bigger payment?" (Dkt. 135 at 69:7–10.) The United States responded "Yes, Your Honor." (Dkt. 135 at 69:11.) But, when given an opportunity to explore that theory further (and to present evidence about it), the United States seemingly abandoned it, instead arguing that under the money laundering conspiracy count "the fact that the money was transferred to [A Rose RE], it still went to the house, so the house is still property traceable to the money laundering offense." (Dkt. 135 at 69:18–24.) The United States then put on testimony about Defendant potentially defrauding the company that ultimately provided the PPE he delivered to LHP Pharma—*not* evidence about him using the $1.5 million delivery to further defraud LHP Pharma or to otherwise advance the scheme. The Court explained, "I still have trouble understanding how if you concede that the . . . 1.5 went to the [A Rose RE] account, . . . how that money can prime the ongoing fraud." (Dkt. 135 at 76:20–23.) Counsel for the United

United States's second argument simply explains the commingling, without explaining how it was involved in the illegal activity.

As the Court already concluded, the mere fact untainted money was commingled with tainted funds (into the purchase of the home) does not mean—standing alone—the untainted money was involved in a money laundering offense.[8]  The United States has simply failed to show "more." So, the Court concludes Defendant is entitled to recover $1 million.

## III.  Conclusion

The Court **ADOPTS IN PART** and **REJECTS IN PART** the Magistrate Judge's R&R (Dkt. 39).  The Court **SUSTAINS IN PART** and **OVERRULES IN PART** Defendant's Objections to the R&R (Dkt. 43). The Court **GRANTS** Defendant's Motion to Hire Counsel of Choice (Dkt. 23).  The Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Amended Motion to Release Seized Funds (Dkt. 30).   The Court

---

States responded "it's all just one scheme, the way the government sees it . . . it's involved in the scheme, so I think involved in is very broadly defined as . . . facilitating."  (Dkt. 135 at 77:4–78:4.)

[8] The United States also cites a case concluding a property purchased with untainted money becomes forfeitable if tainted funds are used to make improvements on the property or to pay property taxes or a loan on the property.  (Dkt. 100 at 11 (citing *United States v. Miller*, 295 F. Supp. 3d 690, 700 (E.D. Va. 2018).)  That authority is not applicable here.

**ORDERS** that $1,000,000.00 of the $4,915,704.39 held as substitute res

by the United States Marshals Services be returned to Defendant.  The

Court **DENIES AS MOOT** Defendant's Motion to Release Seized Funds

(Dkt. 24).

      **SO ORDERED** this 19th day of May, 2023.


                         _____

                         MICHAEL L. BROWN
                         UNITED STATES DISTRICT JUDGE